UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAWN M. BOLEY,

                Plaintiff,                        Civil Action No. 11-15707

      v.                                District Judge Stephen J. Murphy, III
                                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]**

      Plaintiff Dawn Boley appeals Defendant Commissioner of Social Security's denial of her application for Period of Disability, Disability Insurance Benefits, and Supplemental Security Income. (*See* ECF No. 1, Compl.; Tr. 10.) For the reasons that follow, the Court finds that Plaintiff has not shown that the ALJ reversibly erred in evaluating her credibility or accounting for her obesity. Nor has she demonstrated good cause for failing to include a physician's opinion in the record before the ALJ. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED, and, that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

**I. BACKGROUND**

      Ms. Boley was 25 years old when she allegedly became disabled and 28 years old when the Administrative Law Judge ("ALJ") Lawrence E. Blatnik rendered his disability determination. (*See*

Tr. 12, 18, 32.)  She has a high-school education and previously worked as a program aide for developmentally disabled people and as a bagger at a grocery store.  (Tr. 34-36.)  Plaintiff's impairments include fibromyalgia, migraine headaches, and depression (or bipolar disorder).  (*See* Tr. 12.)  Plaintiff told the ALJ that her pain prevents her from working.  (Tr. 36.)

## A.  Procedural History

On April 13, 2007, Plaintiff applied for Period of Disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI.  (Tr. 10.)  In both applications she alleged that she became unable to work on March 31, 2007.  (Tr. 12.)[1]  The Commissioner initially denied Plaintiff's disability applications on August 28, 2007.  (Tr. 10.)  Plaintiff then requested an administrative hearing, and on January 26, 2010, she appeared with counsel before Administrative Law Judge Blatnik, who considered her case *de novo*.  (*See* Tr. 10-18; 25-62.)  In an April 29, 2010 decision, ALJ Blatnik found that Plaintiff was not disabled.  (*See* Tr. 10-18.)  His decision became the final decision of the Commissioner on December 19, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Boley filed this suit on December 30, 2011.  (ECF No. 1, Compl.)

## B.  Medical Evidence

### 1.  *Treatment Prior to the March 31, 2007 Alleged Disability Onset Date*

In July 2004, a chiropractor, Brian Sebesky, noted that Boley suffered from daily headaches, numerous muscle aches, paresthesias throughout her trunk and extremities, and appeared to be under emotional distress.  (Tr. 211.)  It was his "professional opinion" that Boley "fit[] the category for

---

[1]The alleged onset date was selected to accommodate a March 30, 2007 administrative decision denying a prior application for benefits.  (Tr. 29.)

the diagnosis of fibromyalgia." (*Id.*) In a September 2004 "To Whom It May Concern" letter, however, Dr. Sebesky remarked, "I am unable to determine her ability to do work related activities due to the fact that she was only treated a few [times] in my office." (Tr. 212.)

It appears that sometime in late 2004 or early 2005, Dr. Thomas Wilson, Plaintiff's then primary-care physician, referred Plaintiff to Dr. Madhu Arora, a rheumatologist. In January 2005, Dr. Arora assessed Plaintiff's condition as follows:

> Ms. [Boley] complains of arthralgias[,] [i.e., joint pain,] and dry mucous membranes consistent with Sjogren's, [an immune system disorder with the most common symptoms being dry eyes and mouth, Mayo Clinic Staff, *Sjogen's Syndrome* (Aug. 6, 2011), http://www.mayoclinic.com/ health/sjogrens-syndrome/ DS00147,] but there is nothing else to suggest a connective tissue disease at this time, unless [her palm and leg rashes have] something to do with it. She might have fibromyalgia, but [she] doesn't have all the classic trigger points, and I am wondering if that is because of the pain medications she has had. . . . I . . . [gave] her samples of Utlracet to try to see if it will help with her aching.

(Tr. 376.)

Not long after her visit with Dr. Arora, Plaintiff began treating with Dr. Rosemarie Tolson's office. At her first visit in March 2005, Boley reported to a nurse practitioner in Tolson's office that her prior physicians, Dr. Arora and/or Dr. Wilson, had diagnosed her with Sjogren's syndrome and fibromyalgia. (Tr. 261.) The nurse practitioner assessed fibromyalgia. (*Id.*) She prescribed medication and forwarded Plaintiff's name to the fibromyalgia group. (*Id.*)

In June 2005, Plaintiff saw Dr. Tolson. (Tr. 260.) Plaintiff reported that her fibromyalgia mostly affected her lower back and shoulders. (*Id.*) She also reported severe headaches three times a week. (*Id.*) Dr. Tolson's exam revealed an extensive rash on Plaintiff's bilateral lower extremities and cracked and peeling hands. (*Id.*) Dr. Tolson assessed fibromyalgia and prescribed Ultram, a

3

medication for "moderate to moderately severe pain," *see* AHFS Consumer Medication Information, Tramadol, (Oct. 15, 2011) http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960/. (*Id.*)   She also prescribed Imitrex for Plaintiff's headaches.  (*Id.*)

In July 2005, Boley reported to Dr. Tolson that, among the medications she had tried for her fibromyalgia pain, Ultram had worked the best.  (Tr. 259.)  Plaintiff said that it relieved the pain behind her eyes, that her muscle and joint pain was tolerable, and that she did not need additional medication for her fibromyalgia.  (*Id.*)  In contrast, Plaintiff reported that the medication Dr. Tolson had prescribed for her migraines had not helped.  (*Id.*)  Dr. Tolson's assessments were migraine cephalgia, fibromyalgia, and dermatitis.  (*Id.*)  Dr. Tolson also noted, "At this point we need to concentrate on [prophylactic medication] for the migraines since she really does not respond to anything.  So, I have given her Cardizem . . . ." (*Id.*) She also increased Boley's prescription for Elavil, an antidepressant.  (*Id.*)

In August 2005, Plaintiff returned to Dr. Tolson with reports of migraines and a rash.  (Tr. 258.)  Dr. Tolson noted,

> [Ms. Boley] states that nothing is better from what I did last time. When I looked back, I realized that last time, nothing was better from the time before.  She does not seem to respond as I would expect. When I initiate conversation with her, she states "you know, the thing on the wall that talks about depression sounds a lot like me."  I went into this further and she does admit to depressed mood, to headache, to fatigue, to irritability.  So, many of these symptoms are being experienced by the patient.  She states she's got a history of being diagnosed with major depression as well as mania.

(Tr. 258.)  Dr. Tolson diagnosed cephalgia, major depression, and dermatitis.  (Tr. 258.)

In February 2006, Plaintiff returned to Dr. Tolson for a follow-up visit.  (Tr. 257.)  Dr. Tolson remarked, "[Ms. Boley] is a woman that suffers from depression as well as occasional

4

episode of mania, therefore actually the diagnosis is bipolar disease." (*Id.*) Dr. Tolson noted that Plaintiff had previously been to "LifeWays," but that the facility "now state[s] that she is not sick enough to be seen"; Dr. Tolson continued, "however[,] at this point I do believe she has the diagnosis of bipolar." (*Id.*) Plaintiff reported that she had not slept for 36 hours. (*Id.*) Dr. Tolson gave Plaintiff the phone number to LifeWays and noted, "[I] wrote right on there that I believe she has a diagnosis of bipolar." (*Id.*) On exam, Dr. Tolson also found that Boley had pain in her lower back and in her left foot. (*Id.*)

In April 2006, Dr. Tolson noted that "when [Ms. Boley] [tries] to get more extensive counseling or to see a psychiatrist they tell her that she is not severe enough." (Tr. 256.) Plaintiff's primary concern, however, was a racing heartbeat. (*Id.*) A pulse oximetry reading showed a heart rate of 131. (*Id.*) Dr. Tolson prescribed Lopressor for Plaintiff's elevated heart rate. (*Id.*)

In May 2006, Dr. Tolson noted that Lopressor had resolved Plaintiff's tachycardia. (Tr. 255.) In summarizing Boley's mental health, Dr. Tolson wrote,

> [Ms. Boley] is a woman with significant psychiatric problems including possible bipolar . . . . She does admit to decreased mood, decreased motivation, increased interrupted sleep, up and down concentration, and anhedonia. She also states that about once a week, she'll get [a] manic episode where she doesn't feel like she needs to sleep. She can go forever.

(*Id.*) Plaintiff also reported low-back pain and that she was "not doing anything for [it] right now, just suffering through it." (*Id.*) Dr. Tolson's assessment was "probable bipolar disorder," low back pain, and eczema. (*Id.*) Dr. Tolson noted that she would ask "our psychiatrist for a one time visit," and prescribed Naprosyn for Plaintiff's back pain. (*Id.*)

In September 2006, on referral from Dr. Tolson, Dr. Michael Sheth at the Center for Pain Management evaluated Plaintiff. (Tr. 271-74.) Plaintiff told Dr. Sheth that she had been diagnosed

with fibromyalgia about two years prior and that she had treated with a therapist for her depression in the past. (Tr. 271-72.) In terms of pain, Plaintiff reported back, neck, shoulder, and leg pain, as well as headaches. (Tr. 271.) She reported constant pain at the three-out-of-ten level but that her present pain was a six. (*Id.*) Boley noted that neither three rounds of physical therapy nor medications (e.g., Ultram) had helped her pain. (Tr. 271-72.) Dr. Sheth found that Plaintiff had five-out-of-five strength in all muscle groups, that Plaintiff's gait was within normal limits, and that Plaintiff had a full range of cervical motion. (Tr. 273.) However, his exam also revealed that Plaintiff had pain in both shoulders, that squatting increased her pain, and that Plaintiff had a reduced range of lumbar motion. (*Id.*) Dr. Sheth's impressions were chronic generalized pain, fibromyalgia, Sjogren's syndrome, and psychosocial factors affecting her physical condition. (Tr. 274.) Because Plaintiff's insurance would not cover physical therapy, Dr. Sheth recommended that Plaintiff join the YMCA, walk five minutes a day (increasing by one minute per day), start psychosocial counseling, and take Vicodin for fibromyalgia "flare-ups." (Tr. 274.)

In December 2006, Boley reported to Dr. Tolson that while Ultram had helped her lower-extremity pain, it provided no relief for her more-severe back and neck pain. (Tr. 253.) That month, Plaintiff also told Dr. Arora that Ultram had not been helping. (Tr. 371.) Dr. Arora (Plaintiff's rheumatologist) increased Plaintiff's Ultram prescription. (Tr. 372.)

In February 2007, Plaintiff told Dr. Arora that she had achiness in her right shoulder but that Ultram was helping. (Tr. 369.)

### 2. Treatment After the March 31, 2007 Alleged Disability Onset Date

In April 2007, Plaintiff saw Dr. Tolson for tachycardia, Sjogren's syndrome, and headaches (Tr. 252), Dr. Arora for Sjogren's syndrome and fibromyalgia, and Dr. David Hasley for polycystic

ovarian syndrome.  (Tr. 252; *see also* Tr. 266-69, 367.)  Regarding her right-shoulder and neck achiness, Boley thought that none of her medications "have helped much so far."  (Tr. 367.)  Dr. Arora ordered MRIs of Plaintiff's cervical spine, right shoulder, and left and right knees.  (Tr. 379.)  The imaging studies were negative.  (*Id.*)  Dr. Hasley "suggested that[,] for both her polycystic[ ]ovarian syndrome[,] as well as to decrease the risk of getting type 2 diabetes[,] that [Ms. Boley] lose weight."  (Tr. 269.)  Plaintiff, who stands about 5'6" tall, weighed 239 pounds at her exam with Dr. Hasley.  (Tr. 269.)

In June 2007, Dr. Tolson noted that a "Dr. Jack" had suggested Effexor instead of Prozac for depression, but "we didn't know [how] to get [Ms. Boley] on the Effexor."  (Tr. 430.)  (Dr. Tolson was likely referring to insurance issues.)  Dr. Tolson provided samples of Effexor to Boley and told her to "follow up with Dr. Jack as directed."  (*Id.*)  Plaintiff was also taking Relafen for pain relief.  (*Id.*)

In August 2007, John Jeter, a limited license psychologist, and Hugh Bray, Ph.D., a licensed psychologist, conducted a full mental status exam of Plaintiff for the Social Security Administration.  (Tr. 447-49.)  Plaintiff described her self-esteem as "poor" and her mood as "mildly depressed."  (Tr. 448.)  She reported symptoms of easy agitation, sullenness, helplessness and hopelessness, occasional crying spells, constant worrying, and low motivation.  (Tr. 449.)  Her thoughts, however, were logical and organized; in terms of memory, she could recall five numbers forward and recall three-out-of-three objects after three minutes; and, in terms of concentration, she could perform the "serial sevens" test to 44 (she was able to repeatedly subtract seven from 100 down to 44).  (Tr. 448.)  Mr. Jeter and Dr. Bray also noted that Plaintiff "exhibit[ed] no difficulty understanding directions nor [did] she need them to be repeated."  (*Id.*)  Plaintiff scored at the 53rd percentile in

7

reading aptitude and at the 63rd percentile in arithmetic. (Tr. 449.) Jeter and Bray's diagnosis was dysthymia disorder, and they assigned Plaintiff a Global Assessment Functioning score of 55. (*Id.*)[2]

Shortly after the Jeter-Bray evaluation, Dr. Dennis Beshara completed a "Psychiatric Review Technique" form ("PRTF") for the Social Security Administration. (Tr. 452-65.) Having reviewed the Jeter-Bray evaluation, Dr. Beshara found that Plaintiff's dysthymic disorder was not a "severe" impairment. (Tr. 452, 455.) In rating the "B" criteria associated with many of the mental-impairment listings, *see* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Dr. Beshara found that Plaintiff had "mild" limitations in activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. 462.)

Plaintiff returned to Dr. Arora in September 2007. Although her handwriting is a bit difficult to decipher, Dr. Arora apparently diagnosed arthralgia attributable to fibromyalgia, dry month, and right-shoulder pain. (Tr. 503.) In December 2007, Dr. Arora noted that, while the prescribed medications provided some relief, Boley's knee and back pain persisted. (Tr. 499.) Dr. Arora sent Plaintiff for physical therapy. (Tr. 500.)

In March 2008, Dr. Arora's impressions, insofar as the Court can read them, were similar: arthralgia possibly attributable to fibromyalgia and pain from a shoulder impingement. (Tr. 498.) She gave Plaintiff a trial of Neurontin for pain and ordered a shoulder MRI and blood testing. (*Id.*)

---

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

The MRI evidenced "advanced tendinopathy" of the supraspinatus muscle and a suspected "full thickness tear." (Tr. 496.)

In June 2008, Dr. Arora's impressions were right-shoulder tendinitis, fibromyalgia pain, and arthralgias. (Tr. 494.) She increased Plaintiff's prescription of Neurontin and was hopeful that Plaintiff would get financial help for physical therapy. (*Id.*; *see also* Tr. 493.)

In July 2008, a migraine headache caused Boley to seek emergency-room treatment. (Tr. 539.) Plaintiff was given morphine, told to follow-up with Dr. Tolson, and discharged as stable. (Tr. 541-42.)

The next month, Plaintiff had another visit with Dr. Arora. (Tr. 488-89.) Her primary complaints were her back and left knee. (Tr. 488.) Dr. Arora noted that Boley did "better" with medication, but that she had been without medication for about a week because of financial reasons. (*Id.*) Dr. Arora continued Plaintiff on Lodine, another pain reliever. (*Id.*)

In February 2009, Plaintiff saw Dr. Khawaja Ikram for right-shoulder pain at the seven-out-of-ten level. (Tr. 571-72.) Dr. Ikram ordered an MRI, which showed a rotator cuff tear with impingement and mild arthritis. (Tr. 567-68.) In March 2009, Plaintiff underwent right-shoulder surgery. (Tr. 562.) Plaintiff participated in post-operative physical therapy and ultimately met a goal of "verbaliz[ing] 1/10 pain at worst in [her] right shoulder." (Tr. 554.) In late May 2009, Dr. Ikram noted that Plaintiff's shoulder pain was at the two-out-of-ten level. (Tr. 551.)

In March 2009, Plaintiff went to the emergency room with shortness of breath. (Tr. 530.) The primary diagnosis was "[a]cute and chronic asthma." (Tr. 532.) Plaintiff was discharged in stable condition and told to follow-up with Dr. Tolson. (Tr. 535.)

In August and September 2009, Plaintiff, on referral from Dr. Tolson, saw Dr. Stephen

9

Kirkner for ear popping and ringing.  (Tr. 588.)  In a September 2009 letter to Dr. Tolson, Dr. Kirkner noted that his examination did reveal findings "compatible with the diagnosis of eustachian tube dysfunction and benign positional vertigo."  (Tr. 587.)

Plaintiff also saw Dr. Arora in September 2009.  (Tr. 483.)  Boley complained of neck pain, back pain extending down her legs, and headaches.  (*Id.*)  She denied other health problems, however.  (*Id.*)  Dr. Arora believed that Plaintiff's general achiness was likely related to her fibromyalgia.  (Tr. 484.)  Dr. Arora provided samples of Cymbalta.  (*Id.*)

Plaintiff's last visit with Dr. Arora reflected in the record was in December 2009.  (Tr. 481.)  Boley reported achiness especially in her neck, back, and knees, and also stated that she had recently had problems with her surgically-repaired shoulder.  (Tr. 481.)  Dr. Arora noted that her primary medical doctor did not prescribe Cymbalta because Plaintiff was already taking Effexor.  (Tr. 481.)  Dr. Arora provided the following assessment:

> The patient complains of ongoing achiness which most likely is secondary to her underlying fibromyalgia as discussed.  She did have x-rays of her knees as well as her [cervical]-spine about [two] years ago when all of those were normal.  If she has ongoing problems with her right shoulder she is advised to go back and see [Dr. Ikram].  I will try her on Lyrica . . . .  If she has problems with it I told her to talk to her primary physician to see if she could be weaned off the Effexor and then [try] Cymbalta with something else for her depression if that does not work alone . . . .

(Tr. 482.)  It appears that Dr. Arora was also asked to complete a medical source statement.  (Tr. 505-09.)  Although some of the form is completed, Dr. Arora did not complete the part of the form that asks for Plaintiff's functional abilities; she instead wrote, "[Patient] needs a formal work evaluation."  (Tr. 507-09.)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

At her hearing before ALJ Blatnik, Ms. Boley testified primarily about her migraines, Sjogren's syndrome, eczema, back, neck, and shoulder pain, and depression. Plaintiff stated that she had migraines "at least every other day" and that they had worsened in the last few years. (Tr. 38.) She stated that her headaches lasted from "[a]nywhere from an hour to the whole day." (Tr. 39.) Plaintiff also testified to "ocular migraines" that did not cause pain but did "distort[] and blur[] everything" to the extent that she is "pretty much left blind." (Tr. 51.) According to Plaintiff, these migraines occurred a few times per week and "average[d] 15 minutes to normally about a day or two." (Tr. 52.) Boley said that her longest ocular migraine lasted "about four days." (*Id.*)

Plaintiff also stated that her back, neck, and shoulder constantly hurt. (Tr. 39.) She testified that extended walking or sitting increased the pain. (*Id.*) As for her shoulder, Plaintiff acknowledged the April 2009 surgery, but testified that she was still in physical therapy. (Tr. 37.) When the ALJ asked if reaching overhead caused pain, Boley responded that "it hurts to even touch [the] area." (Tr. 38.)

Plaintiff testified that her Sjogren's syndrome exacerbated her eczema symptoms:

> I have eczema, and the Sjogren's syndrome, it actually makes it worse because it attacks any organ that holds moisture like your skin, and eyes, internal organs. I have dry mouth. I have plugs in my tear ducts because my eyes are so dry, they're trying to trap the moisture.

(Tr. 50.) Plaintiff also said that her eczema would cause her hands to "swell up," and her skin to break open. (Tr. 54.)

Boley told the ALJ that she was taking Effexor for her depression. (Tr. 44.) She testified that it had been years since she had seen a therapist, however. (*Id.*) When the ALJ asked Plaintiff

11

about her obesity (Plaintiff testified to being 5' 6" tall and weighing 240 pounds (Tr. 33)), Plaintiff

stated that it affected her "[e]motionally." (Tr. 55.) She elaborated, "I don't like being looked at,

and I don't know what people think about me. I don't know if they're making fun of me in their

minds . . . ." (Tr. 55.) Earlier in her testimony, Plaintiff said that she felt uncomfortable around

people and that she only went grocery shopping "after midnight when there's no one else there, and

my husband's with me." (Tr. 46.)

    Plaintiff testified briefly about a few other ailments. She said that she required daily use of

a rescue inhaler for asthma. (Tr. 53.) (Elsewhere she acknowledged that she smoked a half-pack

of cigarettes per day (Tr. 43).) She testified that her benign vertigo usually caused dizziness once

per day. (Tr. 53.) She also stated that her eyes were negatively affected by headlight glare and that

focusing on a computer or TV screen caused eye pain. (Tr. 50-51.)[3]

    In terms of functioning, Plaintiff testified that walking downstairs to the hearing room caused

her to get lightheaded. (Tr. 40.) She also stated, "The last time I climbed a flight of stairs, it took

me about an hour to get my breath back and my heart to slow down." (Tr. 42.) She testified that

she could stand for less than a half-hour. (*Id.*) Plaintiff said that she could sit for only about 15 to

20 minutes before needing to stand up and walk around. (Tr. 40.) Boley testified to being able to

lift less than gallon of milk. (*Id.*) According to Plaintiff, her husband and mother cooked the meals,

on a "really good day" (which occurred only once a week) she could vacuum a room, and, while she

---

[3]Medical records indicate that Plaintiff reported vision problems and that she was diagnosed with presumed ocular histoplasmosis syndrome. "Presumed ocular histoplasmosis syndrome . . . is characterized by peripheral atrophic chorioretinal scars, peripapillary scarring, and maculopathy." Lihteh Wu, M.D., *et al.*, Medscape Reference, *Presumed Ocular Histoplasmosis Syndrome* (updated Apr. 30, 2012), http://emedicine.medscape.com/article/1224400-overview. Plaintiff's appeal to this Court does not rely on her vision impairment, and so, while the Court has reviewed the entire record, the Court did not present a summary of the vision-related records.

could put clothes in the washer, her husband had to carry the laundry basket and transfer the clothes from the washer to the dryer. (Tr. 46.)

### 2. *The Vocational Expert's Testimony*

At the administrative hearing, the ALJ also solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for hypothetical individuals with functional limitations intended to approximate Boley's. The VE first offered testimony about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of lifting or carrying no more than ten pounds "occasionally" and less than ten pounds "frequently"; capable of sitting for six hours and standing and/or walking for two hours with a sit-stand option; capable of "occasional" stair or ramp climbing, stooping, kneeling, crouching, crawling, and squatting; but incapable of climbing ladders, ropes, or scaffolds; incapable of any repetitive reaching with the right-upper extremity; incapable of work that required a high level of visual acuity; had to avoid concentrated exposure to fumes, odors, dusts, gases, and other respiratory irritants; and was limited to "simple[,] unskilled work with [a Dictionary of Occupational Titles Specific Vocational Preparation] rating of one or two." (Tr. 57-58.) The VE testified that such an individual could not perform Plaintiff's past work but could work as a "cashier II," "ticketer, basically affixing tickets to products that would later be sold," and "addresser, basically affixing labels to envelopes." (Tr. 58.) The VE further said that, in Michigan, 6,000, 3,000, and 3,000 such jobs existed, respectively.

The ALJ then asked the VE about a second hypothetical individual with the same limitations as the first individual except that the second individual was further limited to "no repetitive reaching with the right upper extremity," and "only occasional reaching, pushing, or pulling with the right upper extremity." (Tr. 59.) The VE testified that such an individual would still be able to perform

13

the cashier II and addresser jobs, but could not work as a ticketer.  (*Id.*)

The VE further testified that if all of Boley's testimony about her pain and limitations were credited, there would not be a significant number of jobs that she could perform.  (Tr. 60.)

## II.  THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age,

education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Blatnik found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of March 31, 2007.  (Tr. 12.)  At step two, he found that Plaintiff had the following severe impairments: "fibromyalgia; right shoulder impingement, rotator cuff tear; migraine headaches; ocular histoplasmosis syndrome (POHS), left eye; asthma; tachycardia; depression; and Sjogren's syndrome."  (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 13.) Between steps three and four, the ALJ determined that Plaintiff had the following residual functional capacity:

> She can lift ten pounds occasionally, and less than ten pounds frequently.  She can stand or walk up to two hours, and sit at least six hours, of an eight-hour shift, and requires a sit/stand option that enables her to change position at will.  She should never use ladders, scaffolds, ropes; can only occasionally climb ramps or stairs, stoop, squat, crouch, kneel, or crawl; and only occasionally push, pull, or reach with the right upper extremity.  She should avoid concentrated exposure to fumes, odors, dust, gases or respiratory irritants; and can perform no work that requires a high level of visual acuity.  The claimant is limited to simple unskilled work only with a SVP rating of 1 or 2.

(Tr. 13-14.)  At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.

(Tr. 16.)  At step five, the ALJ found that sufficient jobs existed in the national economy for

someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 17.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from March 31, 2007 through the date of his decision, April 29, 2010. (Tr. 18.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this

16

Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

## IV. ANALYSIS

Plaintiff raises three claims of error. For one, she says that the ALJ's credibility findings were not supported by substantial evidence. (ECF No. 9, Pl.'s Mot. Summ. J. at 13-14; ECF No. 13, Pl.'s Reply to Def.'s Mot. for Summ. J. at 2-3.) She also asserts that the ALJ failed to adequately account for the effects of her obesity, and failed to comply with a Social Security Ruling, S.S.R. 02-1p, that provides how an ALJ should consider the effects of a claimant's obesity. (Pl.'s Mot. Summ. J. at 8-11.) Third, Plaintiff argues that this case should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of a medical opinion not part of the record before the ALJ. (Pl.'s Mot. Summ. J. at 11-12.) The Court considers these claims of error in turn.

### A. Plaintiff Has Not Demonstrated That the ALJ Committed Reversible Error in Evaluating Her Credibility

Given the generalized nature of Plaintiff's credibility argument, the Court begins by emphasizing a matter of appellate procedure: it is Plaintiff's burden to demonstrate that the ALJ

17

erred.  *Lopez v. Barnhart*, No. 04-0745, 2005 WL 1630551, at *5 (W.D. Tex. July 11, 2005) ("It is

plaintiff's burden to prove that the ALJ's decision was not made in accord with the applicable legal

standards or not supported by substantial evidence . . . ."); *Raboubi v. Barnhart*, No. C-03-01613,

2003 WL 22458903, at *4 (N.D. Cal. Oct. 24, 2003) ("Plaintiff bears the burden of establishing that

the ALJ's decision was not based on substantial evidence or that the ALJ's decision was based on

legal error.").   Indeed, one court has reasoned that the placement of the burden is inherent in

substantial evidence review:

> [The substantial evidence] standard of review assumes, of course, that
> a claimant has made an argument and identified specific aspects of
> the ALJ's decision that allegedly lack support in the record.   Where
> a claimant has not done so, the Sixth Circuit has:
>
>> . . . decline[d] to formulate arguments on [claimant's]
>> behalf, or to undertake an open-ended review of the
>> entirety of the administrative record to determine (i)
>> whether it might contain evidence that arguably is
>> inconsistent with the Commissioner's decision, and
>> (ii) if so, whether the Commissioner sufficiently
>> accounted for this evidence.   Rather, we limit our
>> consideration to the particular points that [claimant]
>> appears to raise in her brief on appeal.
>
> *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th
> Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th
> Cir. 1997) ("[I]ssues adverted to in a perfunctory manner,
> unaccompanied by some effort at developed argumentation, are
> deemed waived.  It is not sufficient for a party to mention a possible
> argument in the most skeletal way, leaving the court to . . . put flesh
> on its bones." (citation and quotation marks omitted)).

*Shiveley v. Astrue*, No. 2:11-cv-313, 2012 WL 1231819, at *1 (E.D. Ky. Apr. 12, 2012).

Accordingly, the Court will not develop the particulars of Plaintiff's credibility argument for her.

For reasons that follow, the Court finds that Plaintiff's  arguments, in the manner presented, do not

establish that the ALJ erred in assessing her credibility.

18

Boley's summary judgment brief asserts that the ALJ erroneously determined her residual functional capacity before evaluating her credibility. (Pl.'s Mot. Summ. J. at 13.) Plaintiff first refers to the ALJ's use of the following template language (which, it appears, is included in virtually every ALJ opinion):

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 15.) Plaintiff, relying on this language, then says, "The ALJ determined the residual functional capacity ('RFC') before he considered the effects of Plaintiff's testimony as to her [fibromyalgia] pain and ocular migraine headaches. They both cause long periods of resting almost every day of the week which the VE testified would be work preclusive." (Pl.'s Mot. Summ. J. at 13.) In support of this claim, Plaintiff quotes a lengthy passage form *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), including the following discussion about the above boilerplate "get[ting] things backwards":

> One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity" (the bureaucratic term for ability to work) comes later in the administrative law judge's opinion, not "above"— above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards. . . . [In this case,] [d]oubts about [the claimant's] credibility were . . . critical to [the ALJ's] assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be. In this regard we note the tension between the "template" and SSR 96-7p(4) . . . which states that "an individual's statements about the intensity and persistence of pain or other symptoms or about the

19

> effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." The applicant's credibility thus cannot be ignored in determining her ability to work (her residual functional capacity, in SSA-speak).

671 F.3d at 645.

This Court has previously agreed with the above reasoning form *Bjornson*. *See Tell v. Comm'r of Soc. Sec.*, No. 11-CV-15071, 2012 WL 3679138, at *9-11 (E.D. Mich. July 13, 2012) (Michelson, M.J.) *report and recommendation adopted*, 2012 WL 3542473 (E.D. Mich. Aug. 16, 2012) (Goldsmith, J.). And it does not take a different position now. But this does not mean that Plaintiff has shown reversible error *in this case*. Plaintiff's brief simply block quotes the ALJ's template language, says that the boilerplate shows that the ALJ erroneously determined her residual functional capacity before considering her fibromyalgia and ocular-migraine allegations, and then block quotes *Bjornson*. (Pl.'s Mot. Summ. J. at 13-14.) Plaintiff thus leaves it for the Court to draw its own conclusions about the remainder of the ALJ's credibility analysis.

To expand on this last point, the Court notes that the ALJ did more than rely on the template language. In fact, the ALJ provided six case-specific reasons for discounting Plaintiff's credibility. (Tr. 16; *see also* ECF No. 12, Def.'s Mot. for Summ. J. at 14-17.) While the court in *Bjornson* "stubbed [its] toe" on the ALJ's boilerplate, 671 F.3d at 644, it did not find that its mere use constitutes reversible error, *see generally id.* at 644-49. Instead it went on to consider the ALJ's case-specific reasoning and analyze whether those reasons were supported by substantial evidence. *Id.* at 646-49; *see also Barbera v. Comm'r of Soc. Sec.*, No. 11-CV-13265, 2012 WL 2458284, at *14 (E.D. Mich. June 5, 2012) (Michelson, M.J.) ("Plaintiff is correct that in this case the ALJ used the boilerplate language questioned by the Seventh Circuit . . . . But, as the Commissioner argues,

the ALJ went beyond this form language . . . .") *report and recommendation adopted*, 2012 WL 2389977 (E.D. Mich. June 25, 2012) (Ludington, J.).

Plaintiff has not done the same here.  (*See* Pl.'s Mot. Summ. J. at 14.)  And, as discussed, it is not for the Court to determine whether each of the ALJ's rationales are supported by substantial evidence, and, if so, whether they justify discounting Plaintiff's testimony.  Plaintiff must make some effort to point out why the ALJ's given rationales are faulty or otherwise insufficient.  Quoting the ALJ's boilerplate language and the reasoning from another case does not suffice.

In her reply brief, Plaintiff does not remedy this deficiency.  After asserting that the court in *Berkowski v. Comm'r of Soc. Sec.*, 652 F. Supp. 2d 846, 856-57 (E.D. Mich. 2009) found that the ALJ erred in evaluating the claimant's complaints of pain, Plaintiff makes the following statement: "The ALJ here followed a similar pattern."  (Pl.'s Reply to Def.'s Mot. Summ. J. at 2.)  Without expansion, her argument then immediately shifts to *Doud v. Comm'r of Soc. Sec.*, 314 F. Supp. 2d 671, 678-679 (E.D. Mich. 2003); she says that *Doud* found "[a]n adverse credibility finding was not supported by substantial evidence where the claimant's testimony regarding her mental limitations was consistent with medical and other lay evidence."  (Pl.'s Reply to Def.'s Mot. Summ. J. at 2.)  But, as with *Berkowski*, Plaintiff does not attempt to draw any similarities between ALJ Blatnik's credibility analysis in this case and the erroneous analysis by the ALJ in *Doud*.

Instead, Plaintiff's reply brief shifts the Court's attention to a list of her impairments as found by Dr. Arora.  (Pl.'s Reply to Def.'s Mot. Summ. J. at 2-3.)  But Plaintiff's diagnoses and impairments are not the issue.  The credibility issue instead turns on the limiting effects of these impairments, and whether the ALJ reasonably discounted Plaintiff's allegations about those limiting effects.

21

Finally, right after the listing of impairments, Plaintiff ends her rebuttal argument with the following:

> The full effects of these severe medical conditions was never explored by the ALJ in terms of their effects on [P]laintiff's ability to perform substantial gainful activity. The doctor also found her patient suffered from depression. Similarly, in the *Rogers* case, 486 F.3d 234, 247-249 (6th Cir. 2007), the Court noted that the ALJ's credibility analysis must be supported in the record and went over the daily activities finding that these do not show the ability to work 40 hours a week at pages 238-249. Plaintiff's daily conduct as described by Georgia [Eley, Plaintiff's mother,] (AR 168 & 169) confirms plaintiff's daily conduct and supports her claim of depression.

(Pl.'s Reply to Def.'s Mot. Summ. J. at 3.)

But, again, this passage makes no effort to identify a particular rationale provided by the ALJ — of which there are several — and then argue that the rationale is not supported by substantial evidence. And even if the Court were to further develop this last argument, the evolved version, standing on its own, would not warrant remand. It is true that minimal activities of daily living do not, by themselves, show that a claimant can perform the demands of full-time work. *See Rogers*, 486 F.3d at 248. But this was not the ALJ's only rationale for discounting Plaintiff's allegations of work-preclusive functional limitations. The ALJ also reasoned that (1) "no physician has imposed a work preclusive limitation on the claimant's functioning"; (2) "the claimant has not engaged in work hardening, or other protracted rehabilitative efforts" (3); "[f]or much of the period at issue, the claimant apparently used no prescription strength pain medications"; (4) "clinicians observed the claimant [can] ambulate normally without an assistive device and to retain functional range of motion"; and (5) "claimant's allegations of frequent migraines and 'bad' days that would interfere with her ability to comply with standard attendance requirements are not well supported by the objective medical evidence." (Tr. 16.) Again, there might not be substantial evidentiary support

22

for these rationales; and there might also be good reason to question whether, even if supported, they truly undermine Plaintiff's testimony (and, if so, how significantly). But a court is not an advocate, and it may not pursue these lines of inquiry without Plaintiff first mapping the way.

In short then, because Plaintiff has not adequately developed her credibility argument, the Court declines to find reversible error.

### B.  Plaintiff Has Not Demonstrated that the ALJ Committed Reversible Error in Assessing the Effects of Her Obesity

Plaintiff's primary argument, or at least her lead argument, is that the ALJ erred in evaluating the effects of her obesity.  (Pl.'s Mot. Summ. J. at 8-11; *see also* Pl.'s Reply to Def.'s Mot. Summ. J. at 1-2.)  She says that the ALJ erred in failing to find her obesity a "severe" impairment at step two of the five-step disability analysis.  (Pl.'s Mot. Summ. J. at 9.)  Plaintiff also claims that the ALJ failed to comply with S.S.R. 02-1p, (Pl.'s Mot. Summ. J. at 9-11), which "provide[s] guidance on SSA policy concerning the evaluation of obesity in disability claims," 2002 WL 34686281, at *1.

Starting with the step-two claim, Plaintiff is correct that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) ("This circuit construes the step two severity regulation as a de minimis hurdle . . . ." (quotation marks and citation omitted)).  Plaintiff's body mass index puts her near or in the "extreme" obesity range, *see* S.S.R. 02-1p 2002 WL 34686281, at *2, and, yet, the ALJ did not include Plaintiff's obesity as a severe impairment at step two.  (Tr. 12.)[4]

---

[4]Using a height of 5' 6" and a weight of 240 pounds, which is the weight Plaintiff reported at the administrative hearing (Tr. 33) and at her August 2007 mental status exam (Tr. 447),

But the Commissioner correctly states that the ALJ found many other severe impairments at step two and continued on with the five-step disability analysis. (Tr. 12-18; *see also* Def.'s Mot. Summ. J. at 12-13.) An ALJ does not commit harmful error by excluding an impairment at step two so long as the ALJ finds other severe impairments and then considers the limiting effects of the excluded impairment at steps three through five. *See Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. 2006) ("Even assuming that the ALJ erred by not including 'Borderline Intellectual Functioning' and 'Dependent Personality Disorder' as additional severe impairments in step two of its analysis, the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity."); *Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006).

Thus, the question boils down to whether the ALJ adequately accounted for the effects of Plaintiff's obesity at steps three through five of the disability analysis. S.S.R. 02-1p explains generally how obesity may cause or complicate other impairments:

> Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea. It is associated with endometrial, breast, prostate, and colon cancers, and other physical impairments. Obesity may also cause or contribute to mental impairments such as depression. The

---

Plaintiff's body mass index places her at Level II obesity. S.S.R. 02-1p, 2000 WL 628049, at *2. Plaintiff uses, and the ALJ used, a weight of 250 pounds, (Pl.'s Mot. Summ. J. at 9; Tr. 16), which puts her body mass index at Level III or "extreme" obesity, S.S.R. 02-1p, 2000 WL 628049, at *2.

> effects of obesity may be subtle, such as the loss of mental clarity and
> slowed reactions that may result from obesity-related sleep apnea.

S.S.R. 02-1p, 2000 WL 628049, at *3.

S.S.R. 02-1p also explains how obesity should be accounted for at particular steps of the five-step disability analysis.  Regarding step three, the Ruling states: "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing" and "[w]e may also find that obesity, by itself, is medically equivalent to a listed impairment."  S.S.R. 02-1p, 2000 WL 628049, at *5.  Regarding a claimant's residual functional capacity assessed between steps three and four, the Ruling provides: "The combined effects of obesity with other impairments may be greater than might be expected without obesity. . . .  As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations."  S.S.R. 02-1p, 2000 WL 628049, at *6.  The  Ruling cautions, however,

> we will not make assumptions about the severity or functional effects
> of obesity combined with other impairments.  Obesity in combination
> with another impairment may or may not increase the severity or
> functional limitations of the other impairment.  We will evaluate each
> case based on the information in the case record.

2000 WL 628049 at *6.  Further, the Sixth Circuit has stated that "'Social Security Ruling 02-01p does not mandate a particular mode of analysis,' but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation."  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)).

Regarding Boley's obesity, ALJ Blatnik reasoned:

> The claimant is somewhat obese at five foot six inches tall and 250

25

pounds.  The undersigned is aware that obesity often complicates existing medical problems, and that the effects of this condition may not be readily apparent.  The combined effects of obesity with other impairments may be greater than might be expected without the disorder.  The Administrative Law Judge considered any added and accumulative effects this condition played on her ability to function.  In spite of her weight, clinicians observed the claimant ambulate normally without an assistive device and retain functional range of motion.

(Tr. 16.)

Boley says that this analysis did not comply with S.S.R. 02-1p because she testified that her obesity affected her self image and increased her depression, and yet, the ALJ instead focused on her physical impairments.  (Pl.'s Reply to Def.'s Mot. Summ. J. at 2; Pl.'s Mot. Summ. J. at 10-11.) Plaintiff refers to the following hearing testimony:

> [ATTY:]  And the last thing I wanted to discuss with you is your obesity.  You are overweight, and I'm sure your doctors have advised you of that.   Does that affect your being able to get around physically?
> [BOLEY:] Emotionally.
> Q How does it affect you emotionally?
> A I don't like being looked at, and I don't know what people think about me.  I don't know if they're making fun of me in their minds . . . .

(Tr. 54-55.)  She also points out that earlier in her testimony she averred:

> [BOLEY:] If I go to the grocery store it's usually after midnight when there's no one else there, and my husband's with me.
> [ALJ:] Is that by your choice? You prefer to go there when there's not a lot of people around?
> A Yes.
> Q How big of a group would it take to make you feel that way?
> A I actually don't like being in here.
> Q Okay.  All right.  Just for the record there's five other people in the room, including your husband and your representative.  Hopefully you know them a little bit.
> A Yeah.

26

(Tr. 46-47.)

The Court will assume, without deciding, that the ALJ violated S.S.R. 02-1p by failing to discuss whether obesity heightened Plaintiff's depression after Plaintiff testified that it did so. But Plaintiff has not demonstrated that the error was harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009) (citing decisions for various courts of appeals and noting that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"); *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012) (finding that a possible violation of procedural error did not warrant reversal where claimant had "not met her burden of showing that any error was prejudicial"); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless 'the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'").

Regarding step three, Plaintiff has not cited a single listing, or even a single requirement of a listing, that she would have met or medically equaled had the ALJ determined that her obesity heightened her depression. Plaintiff makes no explicit challenge to the ALJ's findings that she had "mild" restrictions in maintaining activities of daily living, "mild" restrictions in maintaining social functioning, and "moderate" limitations in concentration, persistence, or pace. (*See* Tr. 13.) Plaintiff makes no argument that her obesity affects her depression to the extent that she is markedly limited in two of these "paragraph B" criteria. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04 (requiring "marked" limitations in two of activities of daily living, social functioning, concentration, persistence, or pace, or "marked" limitations in one of those three criteria plus repeated episodes of decompensation, each of extended duration). Her testimony of self-consciousness, standing alone,

27

does not demonstrate this.

Turning to the ALJ's RFC assessment, he restricted Plaintiff to "simple[,] unskilled work only with a SVP rating of 1 or 2." (Tr. 14.)  Plaintiff makes no attempt to explain how her depression — amplified by her negative self-image caused by her obesity — would preclude simple, unskilled work.  And the record evidence does not imply it either.  At the August 2007 mental-status exam with Jeter and Dr. Bray, Plaintiff's weight was the same as at the administrative hearing. (*Compare* Tr. 33 *with* Tr. 447.)  And, not unlike the hearing, Plaintiff told the evaluators that she had low self esteem.  (Tr. 449.)  Yet, at that evaluation, Plaintiff reported being only "mildly depressed," and she was able to complete cognitive tasks commensurate with the requirements of simple, unskilled work: she could remember five numbers forward and four backward, perform the serial sevens test down to 44, she understood proverbs used to test abstract thinking, she exhibited appropriate judgment, her reading and arithmetic test scores were above average, she used problem solving strategies for task completion, and she "exhibit[ed] no difficulty understanding directions [and did not] need them to be repeated."  (Tr. 448-49.)  Further, on her self-completed function report from May 2007, Plaintiff indicated that she had no difficulties with memory, completing tasks, concentration, understanding, following directions, or getting along with others.  (*See* Tr. 155.)  Further still, the Court's review of the record has not uncovered an instance where Plaintiff reported to a medical professional that she had a negative self-image or increased self-consciousness because of her obesity, let alone that she felt so uncomfortable around others because of her obesity that it precluded her participation in some activities.

In sum, on this record, and on the argument presented, the Court cannot say that Plaintiff has shown that the ALJ's failure to explicitly discuss the impact of her obesity on her depression

28

(despite her testimony that her obesity made her self-conscious around others) resulted in harmful error. *Cf. Smith v. Astrue*, 639 F. Supp. 2d 836, 846-47 (W.D. Mich. 2009) ("[S.S.R. 02-1p] does nothing to relieve [Plaintiff] of the burden of marshaling competent medical opinion and evidence to show *specifically* how her obesity exacerbated her other impairments, or interacted with them, to render her incapable of all suitable work.  In the context of judicial review of the ALJ's decision, [Plaintiff] had the burden of showing specifically how the obesity, in combination with other impairments, limited her ability to a degree inconsistent with the ALJ's RFC determination."). Accordingly, remand or reversal is not warranted for the ALJ's (presumed) failure to comply with S.S.R. 02-1p.

### C.  A Sentence-Six Remand Is Not Warranted

Plaintiff alternatively argues for a remand pursuant to sentence six of 42 U.S.C. § 405(g). (Pl.'s Mot. Summ. J. at 11-12.)  That sentence provides: "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; . . . ."  42 U.S.C. § 405(g).  Thus, as the statutory text indicates, a sentence-six remand is only appropriate where a plaintiff can demonstrate that evidence not before the ALJ is "new" and "material," and that there was "good cause" for not producing the evidence earlier.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)).

Boley says that the case should be remanded for consideration of a September 2006 opinion by Dr. Tolson that she did not make part of the record before the ALJ (but did submit to the Appeals Council).  (Pl.'s Mot. Summ. J. at 11.)  The Court disagrees.  First, Plaintiff's evidence is not "new."

Evidence is new only if it was "'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).  The Tolson opinion is dated September 8, 2006 (ECF No. 7 at Pg ID 623), and Plaintiff makes no claim that it was unavailable for production.  Second, Plaintiff has not shown "good cause" for failing to make the opinion part of the record before the ALJ.  Plaintiff implies that she did not know that the ALJ would conclude that no physician had made work-preclusive findings. (*See* Pl.'s Mot. Summ. J. at 11 (citing Tr. 17).)  But a medical opinion from a treating or examining physician that allegedly supports a claim for disability would be relevant regardless.  Indeed, Plaintiff admits that Dr. Tolson's September 2006 opinion had been part of the record in a prior disability claim.  (Pl.'s Mot. Summ. J. at 12.)  Thus, Plaintiff has also not shown good cause.  *See Haney v. Astrue*, No. 5:07-188, 2009 WL 700057, at *6 (W.D. Ky. Mar. 13, 2009) (providing that good cause contemplates "more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability" (internal citations omitted)).

In her reply brief, Plaintiff makes a novel sentence-six argument.  She provides that the Social Security Administration has recently adopted a new ruling pertaining to fibromyalgia, *see* S.S.R. 12-2p, 2012 WL 3104869, and argues, "The ALJ did not have the benefit of [its] guidance when he considered fibromyalgia and [underestimated] it's [sic] effects on [my] ability to perform substantial gainful activity."  (Pl.'s Reply to Def.'s Mot. Summ. J. at 3.)  S.S.R. 12-2p has an effective date of July 25, 2012.  2012 WL 3104869, at *1.  The ALJ's decision and the Appeals Council's denial of Plaintiff's request for further administrative review were both prior to that date. (Tr. 1, 18.)  Plaintiff cites no authority requiring (or even permitting) remand for consideration of a new Social Security Ruling with an effective date after a final administrative decision.  In fact, the

30

Appeals Council "will not find good cause to reopen your case if the only reason for reopening is a change of legal interpretation or administrative ruling upon which the determination or decision was made." 20 C.F.R. § 404.989. And sentence six of 42 U.S.C. § 405(g) makes no mention of judicial remand for the administration to apply a Social Security Ruling that becomes effective after final administrative decision. Remand is therefore unwarranted.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED, and, that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an

31

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  November 28, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on November 28, 2012.

s/Jane Johnson
Deputy Clerk